UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION -- LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>V.<br><br>JAMES RICHARD BAILEY, JR.,<br>    Defendant. | CRIMINAL NO. 5:15-03-KKC<br><br><br>**OPINION AND ORDER** |

*** *** ***

This matter is before the Court on the defendant's motion (DE 35) to suppress a cooperating defendant's out-of-court identification of him, which implicates the defendant in a large cocaine distribution conspiracy, and to further suppress "all evidence obtained directly or indirectly" from the identification.

The defendant, James Richard Bailey, Jr., is charged with one count of conspiring with others to distribute five kilograms or more of a substance containing a detectable amount of cocaine. During the course of their investigation of the conspiracy which covers multiple states and includes numerous members, the investigating officers showed three separate cooperating defendants Bailey's photographs and all three identified Bailey as a member of the conspiracy.

In his motion, Bailey challenged all three identifications. At the hearing on this matter, however, it became clear that two of the cooperating defendants – identified by the government as CD1 and CD3 – had a sufficient relationship with Bailey prior to making the identifications. Accordingly, at the hearing, Bailey dropped any challenge to the identifications made by those defendants and argued only that the identification by the cooperating defendant identified as CD 2 should be suppressed.

At the hearing, Special Agent Troy Stout of the Drug Enforcement Agency testified that this investigation began in February 2013 when an individual driving a truck from California was arrested in Oklahoma with 93 kilos of cocaine destined for Lexington, Kentucky. Officers conducted a controlled delivery of the 93 kilos to two individuals on the north side of Lexington who paid $1.8 million in cash.  One of those individuals was CD 3. The officers then followed CD3 to a residence on the south side of Lexington and the officers obtained a search warrant for the residence. There, officers found an additional 45 kilos of cocaine, along with paraphernalia indicative of a large-scale drug operation, including numerous cell phones, money counters, a vacuum sealer, and ledgers. A fingerprint analysis of the packaging around the 45 kilos identified three individuals including CD1.

Later, in September 2013, officers in Missouri stopped another vehicle coming from California destined for Lexington. This one had 40 kilos of cocaine inside. The officers again conducted a controlled delivery in Lexington and the individual now identified as CD2 showed up to take possession.

Officer Stout testified that he first interviewed CD 2 in November 2013.  CD2 told Agent Stout that he had been recruited to Lexington in July to fill a spot in the cocaine distribution ring left vacant after another member had been arrested. He was told by the conspiracy leaders that his job would be to distribute cocaine to two primary individuals. The leaders told him to get Blackberry phones that were capable of pin-to-pin communications and he was given the phone numbers of his Lexington contacts. CD2 identified one of those contacts as a light-skinned male who was either African American or "mixed race" and between 5'6" and 5'11.'

In December 2013, the officers interviewed CD1 who identified his source of cocaine as "James Bailey."  CD1 testified that he had been receiving cocaine from Bailey for more than

a year. After receiving this information, the officers found a jail booking photograph of Bailey and showed it to CD1 who was able to identify the person in the photograph as his source.

On January 8, 2014, the officers then interviewed CD2 for a second time. CD2 explained that his role in the conspiracy was to receive the cocaine, to distribute it to the two individuals identified by the conspiracy leaders, collect the money, count it, and then make arrangements to transport the money back to California. The officers showed CD2 multiple photographs of multiple suspects to try to determine his source and his customers. CD2 told the officers that he had dealt with an individual named "Moreno," who he described as a light-skinned African-American male between 5'6" and 5'9". He said he communicated with Moreno though Blackberry pin-to-pin messaging. The officers showed CD2 Bailey's jail booking photograph and he was not able to identify it as "Moreno." At a later interview in January, CD2 stated that messages on his phone to and from "John Ramos" were actually with "Moreno."

At this point, officers discovered a Blackberry phone or at least a discarded box for such a phone in Bailey's trash along with documents indicating that the phone had been set up under a fictitious name. In March 2014, the officers again interviewed CD2. This time they showed CD2 a photograph of Bailey from his driver's license. CD2 told the officers that he was 60 to 80 percent sure that the person in the photograph was "Moreno." Agent Stout testified that CD2 explained to the grand jury that he was unable to identify "Moreno" from the booking photograph in January because it was too dark.

Officers then interviewed CD3 who testified that his primary customer was an individual nicknamed "J.B," who he described as between 5'6 and 5'9. He said he had been supplying J.B. for over a year and that he communicated with him through Blackberry pin-

to-pin messaging.

"An identification infected by improper police influence, our case law holds, is not automatically excluded." *Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012). "Instead, the trial judge must screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable misidentification,' the judge must disallow presentation of the evidence at trial." *Id*. (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id*.

To determine whether due process requires the suppression of an out-of-court identification at trial, the court must first decide whether the police used a procedure that was "both suggestive and unnecessary." *Id*. at 724. If they did, the identification is not necessarily suppressed. *Id*. Instead, the court must decide if, in the particular case before it, the improper police procedure created a "substantial likelihood of misidentification." *Id*. (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972))."Reliability of the eyewitness identification is the linchpin of that evaluation." *Id*. at 724-25 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (brackets omitted).

"Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Id*. at 725 (quoting *Biggers*, 409 U.S. at 114.) "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id*.

In cases involving an identification based on the examination of a single photograph, the court should consider the factors articulated in *Biggers* "to determine whether the identification has indicia of reliability such that there is no substantial likelihood of

4

irreparable misidentification." *See United States v. Causey,* 834 F.2d 1277, 1284 (6th Cir. 1988). These factors are: 1) the witness's opportunity to view the criminal at the time of the crime, 2) the witness's degree of attention, 3)the accuracy of the witness's prior description of the criminal, 4) the level of certainty demonstrated by the witness at the confrontation, and 5) the length of time between the crime and the confrontation. *Biggers,* 409 U.S. at 199-200.

Agent Stout testified that CD2 told him he had seen "Moreno" on at least four occasions, two occasions of distributing cocaine to him and two occasions of collecting money from him. These were not casual, chance encounters requiring little attention by the participants. These were intense transactions involving large amounts of cocaine and large sums of cash. Agent Stout estimated that these encounters each extended about an hour and involved "face-to-face," close contact. This is sufficient interaction to indicate that CD2 was aware of what Moreno looked like and that his identification of Bailey was based on his experience, not on the suggestiveness of the single-photo showing.

While it is true that the description of Moreno that CD2 gave Agent Stout could have been more detailed, it is also true that nothing in CD2's description was inconsistent with Bailey's actual physical appearance. Likewise, CD2 could not say with 100 percent certainty that the photograph of Bailey was indeed "Moreno," but he told the officers he was 60-80 percent certain. The vagueness of CD's description of Moreno and his level of certainty are factors that should be explored on cross examination and ultimately argued to the jury. But, given the extent of CD2's interactions with Moreno, they do not render CD2's identification so unreliable that it should not be presented to the jury at all.

Finally, as to the time between CD2's encounters with "Moreno" and the identification of Bailey, CD2 told the officers that he did not come to Lexington until July 2013 and the

5

government states that the transactions occurred in July and August 2013. The identification at issue occurred about eight months later, in March 2014. The Sixth Circuit has recognized that delays of 10 month do not render an identification unreliable. *See United States v. Shield*, 415 F. App'x 692, 703 (6th Cir. 2011).

Accordingly, after having considered the totality of the circumstances, the Court finds that CD2's identification of Bailey was sufficiently reliable to present to the jury who will determine the ultimate weight to be given to it. For these reasons, the Court hereby ORDERS that Bailey's motion to suppress identifications (DE 35) is DENIED.

Dated October 23, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY